**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **KIEWIT CONSTRUCTION COMPANY,** | ) | **CASE NO. 8:04CV148** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM** |
| **vs.** | ) | **AND ORDER** |
| | ) | |
| **CAPITAL ELECTRIC CONSTRUCTION** | ) | |
| **COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This case involves a dispute between Plaintiff Kiewit Construction Company ("Kiewit"), that served as the Construction Manager ("CM") on the Omaha Convention Center and Arena Project (the "Project" ), and the Defendant, Capital Electric Construction Company, Inc., ("Capital"), the electrical subcontractor for the Project.  The Omaha Metropolitan Entertainment & Convention Authority ("MECA") retained Kiewit to be the CM as reflected in the modified AIA Standard Form Agreement dated September 20, 2000. (Filing No. 68, Vlasnik Supp. Aff. at Ex. A).  In consideration for the CM contract with MECA, Kiewit agreed to perform its work under the contract for a guaranteed maximum price ("GMP") and substantially complete the work by August 31, 2003.  (*Id.* at Amendment No. 1, Arts. I and II).  Kiewit, in turn, negotiated GMP contracts with its subcontractors, including Capital.  (Filing No. 50, Exs. 16 and 27).  In the summer of 2003, Kiewit directed Capital to accelerate its work so that the Project could be completed by August 31, 2003. Capital complied, although the work was not completed until September 2003.  By way of this lawsuit, the parties seek to resolve the outstanding issues regarding payment on their contract.

This matter is before the Court on cross-motions for summary judgment.  Kiewit seeks summary judgment both on its claims against Capital and on Capital's counter claims against it.   With regard to its claims against Capital, Kiewit contends that Capital breached the subcontract with Kiewit, and that Kiewit is entitled to retain $275,168, as reflected in Change Order 13.  Kiewit has sought declaratory relief on that claim.  Capital opposes Kiewit's motion contending that there are genuine issues of material fact related to the claim, specifically including whether the $275,168 that Kiewit seeks pursuant to Change Order 13, is due to Kiewit, or is actually owed to Capital pursuant to Change Order 10.  Capital also argues that Kiewit is not entitled to a declaratory judgment because Kiewit owes Capital additional compensation for its work on the Project.

Kiewit also seeks summary judgment on Capital's counterclaims against it.  In Capital's first counterclaim, Capital seeks payment for interference and work disruption that allegedly hampered Capital's progress before the acceleration directive was issued (hereafter the "Pre-Acceleration Claim").  In Capital's cross-motion for summary judgment, Capital seeks judgment as a matter of law on its Pre-Acceleration Claim.  Kiewit argues that it is entitled to summary judgment on the Pre-Acceleration Claim because Capital failed to give Kiewit the written notice required under the subcontract, and because the claim is barred under the subcontract's no-damages-for-delay clause.

In Capital's second counterclaim, Capital seeks additional compensation under Change Order 10 for the work it performed after the acceleration directive was given (hereafter the "Acceleration Claim"), and, in the event that Change Order 10 is not deemed part of the contract documents, then Capital seeks to recover for its Acceleration Claim in quantum meruit.  Kiewit seeks summary judgment on Capital's Acceleration claim, arguing

2

that this claim is barred by the accord and satisfaction that is Change Order 10 and that Capital agreed to be bound by the auditor's review of its acceleration costs. Capital opposes Kiewit's motion for summary judgment on the Acceleration Claim, arguing that the existence of genuine issues of material fact prohibits the entry of summary judgment in favor of Kiewit.

### FACTUAL BACKGROUND

The subcontract between Kiewit and Capital consists of a primary subcontract and several change orders executed by the parties during and after the Project. (Filing No. 50, various exhibits identified as Olson Dep. Ex. 16 (hereafter "Subcontract"), Kinman Dep. Ex. 27 (hereafter "Change Order 1"); Ex. 39 (hereafter "Change Order 10"); and Robert Vlasnik Affidavit at Ex. B (hereafter "Change Order 13"). The terms of the Subcontract were negotiated and executed early in the design phase of the Project.

The Subcontract outlines the rights and responsibilities of the contracting parties. Two provisions of the Subcontract that are particularly relevant to the parties' dispute in this action are Sections 5 and 7. Section 5 address the manner in which changes in the work may be made, and Section 7 addresses delays in the work. In essence, Section 5 gives Kiewit the authority to make changes to the work by written change order.

After the Subcontract was executed, the final plans were prepared, which enabled Capital to estimate the job, and Capital and Kiewit executed Change Order 1, which validated Capital's GMP for the electrical subcontracting work in the amount of $16,415, 817. (Kinman Dep. at 44:10-45:1).[1] The terms of Change Order 1 were incorporated into

---

[1] The complete text of Louis G. Kinman's deposition is part of the Defendant's Index of Evidence found at Filing No. 60 (hereafter "Kinman Dep."). Excerpts from Kinman's deposition are part of the Plaintiff's Index of Evidence at Filing No. 50. Plaintiff's Index of Evidence also includes several Kinman deposition exhibits.

the existing subcontract, as were the terms of all fully executed change orders.  (Ex. 27).

After contracting with Kiewit, Capital retained several local electrical subcontractors to perform the majority of the labor on the Project.  These local electrical subcontractors were Commonwealth Electric, Miller Electric, and Hiller Electric. (Kinman Dep. at 17:19-18:8).  By the end of the Project, according to the Senior Project Executive from Kiewit, Robert Vlasnik, Kiewit had paid Capital, and through Capital the local subcontractors, $18,890,131 for the electrical work on the Project.  (Filing No. 68, Vlasnik Supp. Aff. at ¶3). That amount includes the original GMP reflected in Change Order 1, plus $2,474,314 authorized in Change Orders 2 -12, 14, and 15.  (*Id.*)   Two Change Orders are particularly relevant to this dispute: Change Order 10 and Change Order 13.  According to Vlasnik, Change Order 13, in the amount of $275,168, remains unexecuted and is in dispute. According to Kinman, Change Order 13 reflects Kiewit's attempt improperly to retain $275,168 that Kiewit paid to Capital as an interim payment pursuant to Change Order 10. (Filing No. 60, Ex. C, (hereafter "Kinman Aff."at ¶ 10).[2]  The details of these two Change Orders are considered below.

Capital's Project Manager, Troy Michael Olson, stated that Kiewit and its other subcontractors interfered with Capital's work, noting that steel delivery was delayed, and the subcontractors responsible for pouring concrete, roofing, and making the building water tight, caused most of the delays.  (Olson Dep. at 36:1-21; 40:1-21).[3]  Olson also stated

---

[2] Plaintiff's motion to strike Kinman's affidavit will be denied, except to the extent that the affidavit contains legal conclusions and, in paragraph 13, hearsay related to Edward Page's opinions, which statements will not be considered. (Filing No. 69)

[3]The complete text of Troy Michael Olson's deposition is part of the Defendant's Index of Evidence found at Filing No. 60 (hereafter "Olson Dep."). Excerpts from Olson's deposition are part of the Plaintiff's Index of Evidence at Filing No. 50.  Plaintiff's Index of Evidence also includes Olson deposition exhibit 18.

that, to his knowledge, Capital did not give written notice to Kiewit of its intention to seek any adjustment in the subcontract price. (*Id.* at 35:2-25). With regard to additional time, Olson stated that pursuant to written correspondence, requests for additional time to perform the work were granted in 2002 and the first half of 2003. (*Id.* at 41:20-42:3 and Filing No. 50, Olson Dep. Ex. 18).

The Prime Contract between MECA and Kiewit contemplated substantial completion by August 31, 2003. To obtain substantial completion by that date, Kiewit verbally directed Capital to accelerate its work. That verbal directive was given on June 26, 2003. The next day, Capital's Vice-President of Operations during the Project, Louis Kinman, sent correspondence to Kiewit confirming the acceleration directive and setting forth the conditions under which Capital agreed to accelerate the work. (Kinman Ex. 35). Kinman asked Kiewit's Vlasnik to sign the correspondence indicating his agreement with the terms of the correspondence, and return it to Kinman. (*Id.*) Vlasnik signed the June 27, 2003, correspondence, and under cover of letter dated June 30, 2003, Vlasnik returned the executed authorization letter to Kinman. (*Id.* at CEC 11475).

With regard to the status of the work on June 27, 2003, Kinman stated: "the completion schedule, at this time, is behind for causes certainly not entirely known by Capital Electric except to the extent no portion of those causes are due as a result of Capital Electric, its subcontractors or suppliers." The correspondence also explains that Capital's demand for additional compensation for the acceleration "does not supersede nor in any manner include any additional sums due to [Capital] for our time on the Project prior to June 30, 2003." (*Id.*) In the correspondence, Capital did not put Kiewit on notice that

5

it intended to make a claim for additional compensation arising out of sequencing problems, interference with its work, or other impacts.  (*Id.*)

From June 30, 2003, until substantial completion in early September, Capital had not been paid for what it billed to Kiewit.  After substantial completion was reached, Kiewit and Capital executed Change Order 10, which purported to add $1,073,815 to the GMP, as explained in Attachment No. 1 to Change Order 10.  (Filing No. 50, Kinman Dep. Ex. 39).  Change Order 10 is dated September 25, 2003.  Accordingly to Kinman, Capital executed Change Order 10 because Kiewit had not paid any acceleration costs to Capital on its first two submitted billings.  (Kinman Aff. at ¶9).  Change Order 10 states, in relevant part:

> Pursuant to Section 5 of the subcontract between the parties hereto, the following changes are made therein: *See Attachment No. 1.*
>
> *New guaranteed maximum amount $18,857,291.*
>
> It is understood and agreed by the parties hereto that the foregoing change in subcontract amount constitutes a mutual accord and satisfaction for all changes in the subcontract as set forth in their Change Order.

(*Id.*) (The parties' additions to the change order form language appear in italics).

Attachment No. 1 to Change Order 10  breaks down the acceleration period into two periods and assigns a payment cap for each period.  Attachment 1 distinguishes between the period from June 30 to July 21, 2003, for which Kiewit's interim payment to Capital was capped at $223,997; and the period from July 22 to August 17, 2003, for which Kiewit's interim payment to Capital was capped at $849,818.  The total interim payment was $1,073,815.  Other than the period and payment cap differences,  the language of Attachment No. 1 for each of the two acceleration periods is substantially the same, as follows:

6

This change order confirms and authorizes payment for Kiewit Construction Company's June 26, 2003, direction to Capital Electric to accelerate performance in order to complete all subcontract work by August 31, 2003. This change order also makes the interim adjustments to the subcontract guaranteed maximum price described here.

All interim payment Kiewit makes as a result of this change order/its June 26, 2003 direction to accelerate are subject to adjustment upon completion of Kiewit's audit of Capital Electric's costs and project documentation. The audit will include an audit of all the acceleration costs Capital Electric claimed in the aggregate amount of $2,522,232.28 and the audit results will be based upon the auditor's review of those submitted costs. The interim payment to be made hereunder however, is limited to [the applicable amount stated above].

Should Kiewit's auditors determine that Capital Electric is entitled to additional acceleration costs, Kiewit shall pay the additional costs within thirty days following receipt of the auditors's report. Should Kiewit's auditors determine that Kiewit's interim payments exceed the amount to which Capital Electric is entitled Capital Electric shall remit the excess to Kiewit within thirty days following receipt of the auditor's report.

All other subcontract provisions, including Capital Electric's obligation to continue to prosecute the work pending resolution of this change order, remain unchanged.

Attachment 1 to Change Order 10. It was Kinman's understanding that $1,073,815 was the amount that Kiewit agreed to pay to Capital as an "interim" payment pursuant to Change Order 10 (Kinman Aff. ¶ 9), and, in fact, Kiewit made the "interim" payment of $1,073,815 to Capital. However, in the final accounting on Capital's subcontract, pursuant to which Kiewit released the retainage,[4] Kiewit deducted from the retainage due to Capital the amount of $274,168, which Kiewit contends was an overpayment it made to Capital pursuant to Change Order 10. Thus, Kiewit actually paid Capital $798,647 on Change Order 10. (Kinman Aff. ¶10).

---

[4] Kiewit released the retainage of $1,496,758.80 several months after the Complaint was filed, on August 20, 2004. The Complaint and Answer and Counterclaims were filed on March 29, 2004. (Kinman Aff. Ex. 1 and 2; and Complaint at Filing No. 1). Much of what was in dispute in the initial pleading stage appears to have been resolved by these payments.

Pursuant to the audit requirement referenced in Attachment No. 1 to Change Order 10, a group of three Kiewit employees directed by Kiewit audit supervisor, Ralph Oestmann,[5] reviewed Capital's claim for additional compensation for the acceleration period in the total amount of $2,522,232.28. According to Oestmann, the Kiewit team was responsible for reviewing Capital's costs for accuracy, completeness and applicability. (*Id.* at 22:7-12). They spent one day at Hiller, one day at Commonwealth, and a half day at Capital. (*Id.* at 28:1-7, 80-81; 85:11-876:9). At each location, the team requested similar information such as time system, certified payrolls, union agreements, and equipment information. (*Id.* at 28:25-29:25, 81, 86-87). The information requested was provided. A Hiller employee showed the team the guidelines adopted by the National Electrical Contractors Association ("NECA") for calculating acceleration costs, including the loss of productivity. (*Id.* at 30:14-25). Oestmann stated that his team accepted the NECA method for quantifying loss of productivity, although prior to the review of Capital's claim, Oestmann's team had not used that NECA format. (*Id.* at 31:2- 32:12).

Oestmann stated that his team's work was based on Change Order 10, which was part of the contract documents, and that Change Order 10 did not alter the scope of work. (*Id.* at 55:21-25). Even so, Oestmann admitted that he never had a fully executed copy of Change Order 10 in his possession until after his draft report had been submitted for management review. (*Id.* at 57:2-59:10). Oestmann never asked to see the June 26, 2003, acceleration direction from Kiewit to Capital, and he did not inquire whether the

---

[5] The complete text of Ralph Oestmann's deposition is part of the Defendant's Index of Evidence found at Filing No. 60 (hereafter "Oestmann Dep."). Excerpts from Oestmann's deposition, and Oestmann deposition exhibit no. 2 are part of the Plaintiff's Index of Evidence at Filing No. 50.

acceleration directive was given to all subcontractors on the Project. (*Id.* at 59:12-15). Oestmann also acknowledged that his audit was of acceleration costs through August 31, 2003, although he acknowledged that Capital continued working into September. (*Id.* at 60:8-9; 61:5-10).

The results of the team's work is reported in correspondence dated November 20, 2003, from Oestmann to Randy Zuke of Peter Kiewit Sons, Inc.'s legal department. (Oestmann Dep. Ex. 2). Of the $2,522,233 billed by Capital and its subcontractors during the acceleration period, Oestmann called into question the legitimacy of $1,723,586. (*Id.*)

On November 20, 2003, the same day that Oestmann's correspondence was issued, Kiewit prepared Change Order 13. Change Order 13 purports to be "a final resolution of the acceleration costs authorized in Change Order No. 10 as determined by the audit results reported on November 20, 2003." (Change Order 13, and Filing No. 50, Vlasnik Aff. ¶ 3). Change Order 13 indicates that Capital owes Kiewit $275,168. The $275,168 identified in Change Order 13 is $1000 more than the amount that Kiewit retained from the interim payments authorized to be made to Capital pursuant to Change Order 10.

Capital has retained Edward A. Page, a certified public accountant who has experience in preparing and analyzing claims and costs incurred by electrical contractors. In his affidavit,[6] Page states that he has reviewed the November 20, 2003, report by Oestmann, and that in Page's opinion, Oestmann conducted a review, as distinguished from an audit, because Oestmann did not employ any set of auditing standards or

---

[6] Kiewit's motion to strike Page's affidavit (Filing No. 69) is denied. While foundation for some of Page's statements may be weak, there is sufficient foundation for the affidavit in general for purposes of this motion, in that Page states that he is a licensed, certified public account with more than 15 years of experience, including experience with electrical contractor clients.

guidelines.  In Page's opinion, based on the definition of acceleration costs that he has derived from the June 27, 2003, correspondence from Kinman to Vlasnik, Capital's acceleration costs for the entire period of the acceleration, from June 30, 2003 to September 25, 2003, were approximately $2,191,326. (Filing No. 60, Ex. D, Edward A. Page Aff. ¶¶ 1-10).

### Summary Judgment Standard

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 (8th Cir. 2003).   The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).   The proponent need not, however, negate the opponent's claims or defenses.  *Id.* at 324-25.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts."  *Id.* at 586.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby,*

10

*Inc.*, 477 U.S. 242, 249 (1986).   "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Id.* at 249-50 (citations omitted).

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp.*, 477 U.S. at 327.

## ANALYSIS

In cases presented pursuant to the Court's diversity jurisdiction, the Court must apply state law in defining state-created rights, obligations, and liabilities.  *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938).  The Nebraska Supreme Court's basic rules of contract construction were recently summarized.

> In interpreting a contract, we must first determine, as a matter of law, whether the contract is ambiguous. *Estate of Stine v. Chambanco, Inc.*, 251 Neb. 867, 560 N.W.2d 424 (1997). . . . A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Estate of Stine v. Chambanco, Inc.*, supra. A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous. *Id.* If a contract is ambiguous, the meaning of the contract is a question of fact, and a court may consider extrinsic evidence to determine the meaning of the contract. *Plambeck v. Union Pacific RR. Co.*, supra. In contrast, the meaning of an unambiguous contract is a question of law. *Kropp v. Grand Island Pub. Sch. Dist. No. 2*, 246 Neb. 138, 517 N.W.2d 113 (1994). When a contract is unambiguous, the intentions of the parties must be determined from the contract itself. *Id.*; *Properties Inv. Group v. Applied Communications,* 242 Neb. 464, 495 N.W.2d 483 (1993).

*Ruble v. Reich*, 611 N.W.2d 844, 849-850 (Neb. 2000). The Nebraska Court of Appeals has also recognized a subcontractor who "is successful in proving damages due to unanticipated acceleration may be awarded relief which is generally limited to an equitable adjustment of the amount due under the contract." *Thompson v. Valley Corp.*, 528 N.W.2d 352, 357 (Neb. App. 1995)(relevant contract did not contained a "no damages" clause). With these principles of contract construction in mind, each of Capital's main claims will be addressed.

**PRE-ACCELERATION CLAIM**

Capital seeks $1,958,000 for what it calls its Pre-Acceleration Claim based on sequencing changes, disrupted performance, and other active interference with the work that hampered Capital's prosecution of the work. Both parties seek summary judgment on this claim. Kiewit argues that because Capital was required to give Kiewit written notice of the delay and did not do so, Capital's claim is barred by Section 7(b). Alternatively, Kiewit contends that Section 7(a) is a valid no-damages-for-delay clause that bars Capital's Pre-Acceleration claim. Sections 7(a) and 7(b) are set forth in their entirety below:

Section 7.  DELAYS.

(a)      In the event Subcontractor's Performance of this Subcontract is delayed or interfered with by acts of Owner, Contractor or other subcontractors, or by other events for which Subcontractor is entitled to a time extension under the terms of the Prime Contract, Subcontractor may request an extension of the time for the performance of same, as hereinafter provided, but shall not be entitled to any increase in the Subcontract price or to damages or additional compensation as a consequence of such delay or interference, except to the extent that the Prime Contract entitles Contractor to compensation for such delay, and then only to the extent of any amounts that Contractor may, on behalf of Subcontractor, recover from Owner for such delay.

12

(b)     No allowance for an extension of time for any cause whatsoever shall be claimed by, or granted to, Subcontractor unless Subcontractor shall have made written request upon Contractor for such extension within forty-eight (48) hours after the event giving rise to such request or, if the Prime Contract provides for a shorter period, within sufficient time to permit Contractor to give notice to Owner within the time allowed by the Prime Contract for such notice. [7]

Capital contends that the written notice requirement is irrelevant, and I agree, although for a different reason than that advanced by Capital.  Capital contends that the written requirement is triggered only if Capital requested more time to complete the work. Capital points out that it did not request more time, only more money, and, therefore, it was not required to give notice to Kiewit of its Pre-Acceleration claim.  I am not persuaded by this argument given the language in Section 7(a).  When Section 7 is read in its entirety, there is no ambiguity.  Section 7 states that damages, additional compensation, and increases in the contract price are not available to Capital based on delays or interference with Capital's work on the Project that are caused by MECA, Kiewit, or Kiewit's subcontractors. Rather, absent the applicability of one exception, [8] Capital's only relief from delays and interference caused by others was to seek from Kiewit an extension of time to complete its work.  Section 7(b), which relates to the requirement of the subcontractor to

---

[7] There is also a subparagraph (c) to Section 7, which applies to delays caused by preparation of drawings and securing Owner approval, but its terms are not relevant to the pending motions.

[8] An exception to the no-damages clause exists where, under the Prime Contract, Kiewit becomes entitled to additional compensation from MECA for a delay, and under such circumstances, Capital could recover only for amounts that Kiewit recovers from MECA for the benefit of Capital for the delay.  Neither party has produced evidence that this exception to the no-damages clause applies in this case.

13

give written notice of the delay or interference, is triggered by the subcontractor's request for more time.  It is not triggered by the subcontractor's request for more money, because the subcontractor is barred from seeking additional money under the subcontract, under the circumstances presented here.  I find that Section 7(a) constitutes a valid no-damages-for-delay clause that bars Capital's Pre-Acceleration Claim.

This plain reading of Section 7(a) is supported by Nebraska law.  Kiewit relies upon the Nebraska Supreme Court's decision of *Siefford v. Housing Authority*, 223 N.W.2d 816 (Neb. 1974) in support its position.   *Siefford* set forth the general rule permitting the recovery of delay damages and also addressed the impact of a "no-damages clause" and the presence of an extension-of-time provision.

> We believe that the correct rule is that a contractor has the right to recover damages resulting from delay caused by a breach of contract by the other party.  Thus, where there is a breach of contact by the owner or the other party, and the breach of contract results in delay in the work of the contractor, and the delay in the work causes damage to the contractor, the contractor has a right of recover **in the absence of a "no-damage clause"** or other provision to the contrary in the contract and even though the contract contains a provision for an extension of time.

*Id.* at 820 *emphasis added* quoting *Roberts Constr. Co. v. State*,  111 N.W.2d 767, 771 (Neb. 1961).  The "no-damage clause" in *Siefford* provided: "No payment or compensation of any kind shall be made to the Contractor for damages because of hindrance or delay from any cause in the progress of the work, whether such interferences or delays be avoidable or unavoidable."   *Id.*    The *Siefford* court concluded under such contract language, a contractor could be charged with assuming the risk of delays caused by the owner – even if the delays were avoidable – when the delays were not caused by the

14

owner's arbitrary or unreasonable conduct, and absent concealment, misrepresentation, fraud, bad faith, and malicious intent.  *Id.* at 823.

The no-damages provision in Section 7(a) addresses delays and interference-type claims, and states, in relevant part:

> In the event Subcontractor's Performance of this Subcontract is delayed or interfered with by acts of Owner, Contractor or other subcontractors, or by other events for which Subcontractor is entitled to a time extension under the terms of the Prime Contract, Subcontractor may request an extension of the time for the performance of same, as hereinafter provided, but shall not be entitled to any increase in the Subcontract price or to damages or additional compensation as a consequence of such delay or interference. . . .

Given that one of the main purposes of construction contracts is to allocate the risks of construction among the parties, no-damages-for-delay clauses are used to assign the risk of delays, for whatever cause, upon one of the contracting parties, with the assumption that the party bearing the risk has bargained for a price that covers the burden of carrying the risk.  For purposes of these cross-motions, I assume that the breach of contract,  the resulting delay, and the ensuing damage, were caused by Kiewit or its other subcontractors, and not by Capital.   Under these assumptions, Capital can recover additional compensation under the subcontract only if Section 7 is unenforceable because of Kiewit's concealment, misrepresentation, fraud, bad faith, or malicious intent.  There is no evidence of such malfeasance by Kiewit in the record.  Accordingly, I conclude that Capital's Pre-Acceleration claim is barred by the valid no-damages-for-delay clause that is Section 7(a) of the subcontract, and Kiewit is entitled to summary judgment as a matter of law on Capital's counterclaim against it.[9]

---

[9] For other cases enforcing "no-damages" clauses, *see, e.g., Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 719 F.2d 1335, 1339 (7th Cir.1983) ( "delayed ...

Capital has argued that Section 7(a) does not bar its claim for Pre-Acceleration damages because, at the time that the acceleration order was given, the Project was already behind schedule.  There seems to be no dispute that the Project was behind schedule given Kiewit's direction to accelerate the work in order to meet the August 31, 2003, completion date.  However, the reason the Project fell behind schedule is in dispute. While that factual issue may bear on Capital's Acceleration Claim, it has nothing to with Capital's Pre-Acceleration claim, because, even if Capital was behind before the acceleration directive through no fault of its own, then its only recourse was to seek an extension of time.

**ACCELERATION CLAIM**

Kiewit also seeks summary judgment against Capital on its Acceleration claim. Once Kiewit directed Capital to accelerate its work, Capital's contractual protection against interference with its work resulting in delay, that is, obtaining an extension of time to complete the work, became unavailable. The *Siefford* court acknowledged that damages may be available for accelerated work, even in the presence of a valid no-damages clause, and that a key issue in determining such damages is  whether the contractor was on schedule at the time the acceleration directive was given, and if the contractor was not on schedule, whether the lack of progress was due to some fault of its own or the fault of a third party over which the contractor had no control.  *Id.* at 820.  The *Siefford* court found that the contractor was continually behind schedule due to its own shortcomings, and so

_____

or obstructed or hindered"); *and Peter Kiewit Sons Co. v. Iowa Southern Utilities Co.*, 355 F.Supp. 376, 383 (S.D. Iowa 1973).

the Court refused to grant it damages based on the owner's direction to accelerate the work.

Kiewit contends that Change Order 10 controls the disposition of Capital's Acceleration claim. Kiewit argues that Change Order 10 is an accord and satisfaction, as is stated in the pre-printed language on the change order form. Kiewit contends that by Change Order 10, the parties agreed to be bound by the results of a Kiewit audit of Capital's acceleration costs. Kiewit states that the audit determined that Kiewit had overpaid Capital in the amount of $275,168. Accordingly, Kiewit asks this court to deny Capital's Acceleration Claim and enter declaratory judgment in favor of Kiewit, stating that Kiewit does not owe Capital any additional compensation under the contract and that Kiewit overpaid Capital and is entitled to keep $275,168 recorded in Change Order 13.

Capital opposes Kiewit's motion, arguing that Change Order 10 is not an accord and satisfaction. Capital characterizes Change Order 10 as an agreement by Kiewit to make an interim partial payment that was due to Capital as a result of Kiewit's acceleration directive, and Capital's agreement to accept an interim partial payment pending a final audit. (Kinman Dep. 92:17-18). Capital also argues that while Change Order 10 references the June 26 acceleration order, it does not address the June 27, 2003, correspondence from Capital to Kiewit memorializing the terms under which Capital agreed to accelerate its work, and it did not resolve all the outstanding claims between the parties.

"The key element of accord and satisfaction is the intention of the parties, which as a rule presents a question of fact. But it becomes a question of law if the evidence, directly or through reasonable inferences, creates no conflict as to intention." *Black v. Denver U.*

17

*S. Nat. Bank*, 362 F.2d 38, 41 (8th Cir. 1966). See also *Geeslin v. Knight Bros., Inc.*, 554 F.2d 865, 866 (8th Cir. 1977) citing *United States v. Aetna Casualty & Surety Co.*, 480 F.2d 1095, 1098 (8th Cir. 1973). The Nebraska Supreme Court has identified the requirements of an accord and satisfaction:

> To constitute an accord and satisfaction, there must be (1) a bona fide dispute between the parties, (2) substitute performance tendered in full satisfaction of the claim, and (3) acceptance of the tendered performance. *Mischke v. Mischke*, 253 Neb. 439, 571 N.W.2d 248 (1997).

*Simons v. Simons,* 624 N.W.2d 36, 40 (Neb. 2001). When the parties do not intend for a writing to operate as a full discharge of the amounts due, then it is not an accord and satisfaction. *See, i.e., United States v. Aetna Cas. & Sur. Co.,* 480 F.2d 1095, 1099 (8th Cir. 1973). By its own terms, Change Order 10 was not intended to operate as a full discharge of amounts due to Capital. Despite the pre-printed form language, Attachment 1 to Change Order 10 clearly references "interim payments" and an "audit" and "review" that is to be performed in the future. These references persuade me that there is, at a minimum, a genuine issue of material fact whether Change Order 10 is an accord and satisfaction. Change Order 10 contemplates a future accounting of Capital's acceleration costs, and references "interim" payments, which means that they are not final payments.

Kiewit argues that even if Change Order 10 is not an accord and satisfaction, it is part of the contract documents, and it plainly and unambiguously binds Capital to the results of Kiewit's audit of Capital's acceleration costs. Whether a contract is ambiguous, and the meaning of an unambiguous contract are questions of law in Nebraska. *See Big River Constr. Co. v. L & H Properties, Inc.,* 681 N.W.2d 751, 755 (Neb. 2004); *Wood v. Wood,* 667 N.W.2d 235, 239 (Neb. 2003).

18

> A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.  *Id.*  If a contract is ambiguous, the meaning of the contract is a question of fact . . . .

*Ruble,* 611 N.W.2d at 849-50.

I find that Change Order 10 is undeniably part of the contract documents.  I also find that the parties agreed to be bound by the results of a future accounting of some type.  I conclude, however, that an ambiguity exists in Change Order 10, because reference is made both to a "review" and to an "audit."  The meaning of this distinction, if any, and the parties' intent regarding the nature of the future accounting, are in dispute.   Accordingly, summary judgment on Capital's Acceleration Claim, in either party's favor, is not appropriate.

It is unclear whether the parties intended to incorporate Capital's June 27, 2003, correspondence and Kiewit's approval of it into Change Order 10.  It is also in dispute whether an audit, which at least connotes some measurement against certain industry standards was conducted, or whether a review of costs is materially different from an audit.  Given Oestmann's testimony about his use of the NECA standards in some areas, and not in others, and the genuine issues regarding whether the NECA standards were properly applied by Kiewit in the review, specifically on the loss-of-productivity and overtime claims, I find there are genuine issues of material fact that prevent summary judgment.  I am mindful that generally, an audit is binding upon the parties "except as that result could be claimed to rest on fraud or on mistake so gross as to have amount to legal irresponsibility in the undertaking."  *Sanitary Farm Dairies v. Gammel ,* 195 F.2d 106, 111 (8th Cir. 1952).

19

I find, however, that there are genuine issues regarding whether Oestmann was properly qualified to conduct an audit of an electrical subcontractor,[10] if indeed an audit and not a review of costs is what the parties agreed to, and whether gross mistake was made in the application of the NECA standards to Capital's Acceleration Claim.  *Id.*

Because I conclude that there are genuine issues of material fact with regard to the status of Change Order 10 as part of the contract documents, I will also deny Kiewit's motion for summary judgment on Capital's quantum meruit claim.  Summary judgment in the form of declaratory relief in favor of Kiewit on its claim that it owes Capital no additional compensation is also denied.

**CONCLUSION**

For the reasons provided in this memorandum, I conclude that Capital's Pre-Acceleration claim is barred by Section 7 of the parties' subcontract, that Kiewit is entitled to summary judgment on that claim, and that there are genuine issues of material fact remaining on Capital's Acceleration claim.  This matter is currently schedule for a non-jury trial to commence on Tuesday, November 14, 2005. The parties are advised to stay in contact with my chambers to determine the order in which this case may be called.

---

[10] Oestmann has a degree in accounting and business administration, and upon his graduation, Oestmann went to work for Kiewit.  He first worked on project sites, performing "all business functions" including payroll, accounts payable, subcontract administration, and management reports.  (Oestmann Dep. at 8:16-9:19). After about six years, Oestmann became the district business manager for the group that performed excavation, tunneling and sewer work, which he did for twelve years.  (*Id.* at 10:2-11:3).  In 1999, Oestmann became the audit supervisor for Peter Kiewit Sons' Inc..  (*Id.* at  12:12-19).   Oestmann estimated that 90 percent of his work as audit supervisor is internal auditing.  (*Id.* at 15:13 - 16:14).  The other 10 percent of his time is spent auditing subcontractors. (*Id.* at 16:15-20).

IT IS ORDERED:

1.    Kiewit Construction Company's Motion for Summary Judgment (Filing No.
      48) is granted with regard to Capital's Pre-Acceleration Claim and is denied
      in all other respects;

2.    Capital Electric Company's Motion for Summary Judgment (Filing No. 58) is
      denied;

3.    The Motion to Strike (Filing No. 69) is granted with regard to the Affidavit of
      Thomas A. Moore, and is denied with regard to the Affidavits of Louis G.
      Kinman II and Edward A. Page; and the Defendant's Objections to the
      Motion to Strike (Filing No. 70) are overruled with regard to the Moore
      affidavit and are sustained with regard to the Kinman and Page affidavits.

4.    A separate judgment shall be entered at the conclusion of this case.

Dated this 12th day of October, 2005.

                                        BY THE COURT:


                                        s/Laurie Smith Camp
                                        United States District Judge